**SCHWABACH & COMPANY, Plaintiff,**

v.

**GULF SHIPSIDE STORAGE CORPORA-TION et al., Defendants.**

Civ. A. No. 6734.

United States District Court
E. D. Louisiana,
New Orleans Division.
April 15, 1959.

Monroe & Lemann, Nigel Rafferty, Ralph N. Jackson, New Orleans, La., for plaintiff.

Deutsch, Kerrigan & Stiles, Malcolm W. Monroe, New Orleans, La., Mendes & Mount, J. J. Killea, New York City, for Underwriters at Lloyd's, etc.

Cahn & Provensal, Sidney W. Provensal Jr., New Orleans, La., for Gulf Shipside Storage Corp.

**J. SKELLY WRIGHT, District Judge.**

This case involves a phantom certificate of insurance issued, according to its face, by authority of certain unnamed "Underwriters, at Lloyd's, London and/or Companies." It demonstrates that anyone relying on such or similar certificates may find himself without insurance because, contrary to public belief, Lloyd's is not an insurer[1] and certificates issued using its name are but hunting licenses to find who the unnamed insurers are, if indeed they do exist. Here Lloyd's denies their existence.

Schwabach and Company was the owner of cotton stored in the warehouse of the Gulf Shipside Storage Corporation. In this action it sues Gulf and its alleged liability insurer, "Underwriters, at Lloyd's, London and/or Companies" for damage to the cotton while in storage. Gulf has cross-claimed against Lloyd's as its liability insurer. The only issue before the Court at this time is the validity of Certificate of Insurance No. WA–1994 covering warehouseman's legal liability and issued to Gulf "In accordance with authorization granted to J. K. Seear (U.S.A.), Ltd., by certain Underwriters, at Lloyd's, London and/or Companies whose names and the proportions underwritten by them are or will be on file in the office of said J. K. Seear (U.S.A.), Ltd. and also on file in London, England."

J. K. Seear (U.S.A.), Ltd., a corporation chartered in Colorado, is a surplus line brokerage firm engaged in forwarding risks to J. K. Seear & Co., Ltd., London, Lloyd's insurance brokers. Although both Seear firms are incorporated, the individual, J. K. Seear, seems to be the principal figure in each. Seear (U.S.A.) has no floor privileges at Lloyd's. When there is a risk to be covered, it is forwarded to Seear, London, which offers it on the floor at Lloyd's unless cover authority[2] for such risk is already available. Underwriters at

[1]. In Richards, Insurance, Vol. 1, § 11, pp. 40, 41, it is stated:
"A Lloyds organization is essentially an association of persons who underwrite risks as individuals. The personal resources of each underwriter stand back of the fractional part of the loss which he assumes to insure against. Since liability is several and joint, each member of Lloyds is required to make a substantial deposit upon becoming a member, and all premiums collected are set aside in a trust fund to be held until the discharge of all liabilities under the policies. Today each underwriter is represented by an agent who in turn may represent a group of ten or fifty underwriters or a 'syndicate.' The agent has power to bind each member of his syndicate for predetermined fractions of whatever percentage of the entire risk the agent decides to write for the broker representing the applicant for insurance. Lloyds of London engages in every conceivable kind of insurance business, excepting only life insurance."

[2]. The expert witness, Fisk, in describing cover authority, stated:
"Well, cover authority, to begin with, your Honor, is normally something which is granted by underwriters at Lloyd's to a British broker. That broker is granted this authority to write within limitations of the cover, without having to go back to Lloyd's on what we call the 'open market' and place the risk. In other words, he is giving binding authority just as a local agent might be granted authority by the companies he represents. And that normally is subject to further approval by the leading underwriter. Sur-

Lloyd's deal only through Lloyd's brokers, such as Seear, London. Coverage of a risk at Lloyd's consists of the subscribing underwriters signing a slip indicating the amount of their participation. Once this slip is signed, covering a particular risk or for broker authority covering certain risks generally, a Lloyd's broker may issue the certificate of insurance.

In addition, a Lloyd's broker may give surplus line brokers in various countries, such as Seear (U.S.A.), authority to issue the certificate. The certificate, like the one in suit, is on a Lloyd's form. The certificate shows that it is issued in behalf of certain "Underwriters, at Lloyd's, London and/or Companies" who "bind themselves, each for his own part and not one for another, in favor of" the assured to cover the risk described therein. The names of the subscribing underwriters are not shown on the certificate but their names, according to the certificate, should be on file with the issuing broker or with the Lloyd's broker in London. Here there is no documentary information concerning negotiations for, or the issuance of, the certificate in suit, nor of underwriters thereon, the subpoena duces tecum being returned unsatisfied because all files concerning the matter had been shipped to London.[3]

In August 1955, Bodet, an insurance broker generally handling the insurance problems of the defendant Gulf Shipside Storage Corporation, applied to J. K. Seear (U.S.A.) for Combined Warehousemen's Legal Liability and Fidelity Coverage for his client.[4] Seear (U.S.A.) advised Bodet that it would endeavor to have the risk accepted by underwriters at Lloyd's. In December 1955, Seear (U.S.A.) advised Bodet that it had succeeded in placing the risk and on January 11, 1956 Certificate WA–1994 insuring Gulf was sent from the office of Seear (U.S.A.) to Bodet.

Certificate No. WA–1994 is a broker's certificate issued by Seear (U.S.A.) on the customary Lloyd's form certifying that it is authorized to, and does thereby, bind, in accordance with the terms of the certificate, certain unnamed "Underwriters, at Lloyd's, London and/or Companies." As far as this record shows, no slip subscribed to by underwriters at Lloyd's covering this risk was ever issued. It should be stated again that a subpoena duces tecum served on Seear (U.S.A.) to produce the documents which would indicate whether this risk had been placed was returned unsatisfied because the Seear (U.S.A.) file which would have contained the names of the underwriters, if any, had been shipped to London.

By letter dated February 9, 1956 Seear (U.S.A.) advised Bodet that "the nego-

plus line brokers in the United States who are not British brokers would normally never be granted cover authority by underwriters at Lloyd's of London. The British broker having such authority from underwriters might, in turn, grant cover authority on his own to such a surplus line broker here in the United States, under similar terms and conditions." (Transcript, p. 106).

3. Preparatory to taking the deposition of Harold Stern, assistant secretary-treasurer of J. K. Seear (U.S.A.) Ltd., in Kansas City, Missouri, on June 6, 1958, attorneys for plaintiff obtained a subpoena duces tecum from the United States District Court for the Western District of Missouri, Western Division, calling for the production of all records relating to the Gulf Shipside insurance transaction on file in the office of J. K. Seear (U.S.A.) Ltd. None of this file was made available, either at the taking of the deposition or at the later trial of this issue. Stern explained that the file was sent to J. K. Seear & Co., Ltd., in London on or about January 2, 1958, "and that was in response to a letter they had written on December 30th saying to send the file." The amended complaint, bringing into issue the question of coverage under Certificate WA–1994, was filed August 15, 1957, a few months before the file containing information pertinent to the issuance of the certificate was ordered removed to London.

4. At the time, neither Gulf nor Bodet had had prior dealings with Seear (U.S.A.). Seear (U.S.A.) had, however, solicited the placing of risks from Bodet.

tiations which we had completed regarding this risk have entirely fallen through" and that "inadvertently policies were issued for part of the risk which had been arranged tentatively and also your account was debited in error with the premium of this part of the risk." The letter ended stating "we should be very glad if you would reply to this letter confirming that you understand that no coverage whatsoever is in force on this risk." Bodet replied to the Seear (U.S.A.) letter of February 9, 1956 on February 16, 1956 as follows: "Thank you for your letter of February 9th which as stated to Mr. Stern is most disappointing. We have no alternative but to cooperate with you in your dilemma by accepting your no coverage advice."

Bodet testified that he advised the president of Gulf Shipside of the February 9th letter from Seear (U.S.A.) and that he was authorized by his principal to accept the no coverage advice contained therein. The president of Gulf Shipside, Weil, denies that he was so advised, insisting that he was under the impression throughout 1956 that the insurance was in effect. Unfortunately, there is no decisive documentary evidence which would resolve this conflict between Bodet and his principal. There is nothing in writing in which Bodet advised Weil, nor is there anything in the written communications of Weil which would indicate that he was unaware, that the certificate in suit had been cancelled. An analysis of the account books of Bodet and Gulf is also unavailing. In May 1956 Gulf's open account with Bodet was credited with the return of the premium, but Gulf's books reflect no corresponding entry.

■ The defendants, "certain Underwriters, at Lloyd's, London and/or Companies," first maintain that this Court does not have jurisdiction over them and that the service of process is deficient. Since an insurance company which accepts a risk in a state subjects itself to the jurisdiction of the courts of that state as well as to service of process provided by the laws thereof, this defense is without merit.[5] The second defense is simply that Certificate No. WA–1994 was never in force since no subscribers to the risk have been shown, at Lloyd's or elsewhere. Finally, underwriters say that, in any event, the certificate was "cancelled, rescinded and/or withdrawn ab initio by J. K. Seear (U.S.A.) Ltd. in February of 1956," months before the damage in suit occurred.

The position of plaintiff Schwabach & Company, as well as the cross-claimant, Gulf Shipside, is also a model of simplicity. Citing authorities,[6] they state that since the certificate was issued by one having apparent authority, the principal is bound thereon irrespective of actual assent thereto. They say further that the underwriters at Lloyd's cannot avoid their responsibility on the certificate by remaining incognito. As to the alleged cancellation, they maintain that the laws of Louisiana prescribe certain formalities for the cancellation of insurance such as written notice "to the insured or to his representative in charge

5. McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223; LSA–R.S. 22:1253, subd. A, which reads as follows:

"A. The transacting of business in this state by a foreign or alien insurer without a certificate of authority and the issuance or delivery by such foreign or alien insurer of a policy or contract of insurance to a citizen of this state or to a resident hereof, or to a corporation authorized to do business herein, is equivalent to an appointment by such insurer of the Secretary of State and his successor or successors in office, to be its true and lawful attorney, upon whom may be served all lawful process in any action, suit or proceeding arising out of such policy or contract of insurance, and the said issuance or delivery is a signification of its agreement that any such service of process is of the same legal force and validity as personal service of process in this state upon it." * * *

6. Restatement, Agency 2d §§ 159, 160; 2 Am.Jur., Agency §§ 101, 102.

of the subject of the insurance" [7] and that these requirements have not been complied with.

It is indeed unfortunate that the records of Seear (U.S.A.) concerning the negotiation for and placement of the risk in suit are not available. These records would doubtless disclose which, if any, underwriters subscribed to the risk. Absent these records, Schwabach and Gulf Shipside are relegated to an attempt to show apparent authority to bind "certain Underwriters, at Lloyd's London and/or Companies" by Seear (U.S.A.). The certificate in suit itself indicates that the risk was covered by such underwriters, and it is further shown that Seear (U.S.A.) habitually used the Lloyd's certificate form to certify coverage of risk to assureds without showing thereon who the subscribing underwriters are, all in accordance with standard Lloyd's practices. These facts, according to Schwabach and Gulf, make out a case of apparent authority which estops the defendant insurers from denying coverage on the risk in suit. Defendant, outlining at length the manner in which Lloyd's does business, states that the certificate in suit is but a scrap of paper and

that the unnamed underwriters shown thereon as binding themselves to the risk simply do not exist.

Certificate No. WA–1994 is on the usual Lloyd's form and is indistinguishable from thousands of other such certificates binding unnamed insurers at Lloyd's. For years the insurance business of the world has been conducted on the basis of such certificates. It is a little late in the day to refer to them as scraps of paper. Unquestionably, as this case demonstrates, for the security of those who place their trust in such certificates, it would be better if the "Underwriters, at Lloyd's, London and/or Companies" were named thereon.[8] But assureds generally are not in a position to dictate the manner in which their certificates of insurance are issued, nor the content thereof.

■ Fortunately, it is not necessary to resolve this issue of apparent authority. Assuming that Certificate No. WA–1994 was validly issued, apparently or otherwise, the risk thereunder was validly terminated by Bodet's acceptance of Seear U.S.A.'s no coverage advice contained in its letter of February 9, 1956. The letter of February 9th states plainly

---

7. LSA–R.S. 22:636, subd. A reads as follows:

"A. Cancellation by the insurer of any policy which by its terms is cancellable at the option of the insurer, or of any binder based on such policy, may be effected as to any interest only upon compliance with either or both of the following:

"(1) Written notice of such cancellation must be actually delivered or mailed to the insured or to his representative in charge of the subject of the insurance not less than five days prior to the effective date of the cancellation."
* * *

Certificate WA–1994 contained this provision in its cancellation clause:
" * * * This Certificate may also be cancelled by or on behalf of Underwriters by 10 days' notice given in writing to the Assured, his broker or agent, at his last known address, and the premium hereon shall be adjusted on the basis of the Underwriters receiving or retaining pro rata premium. Notice shall

be deemed to be duly received in the course of post if sent by pre-paid letter post properly addressed."

8. See an article by Herbert A. Kuvin, "Lloyd's of London and Problems Arising by Reason of Its Business in this Country," Insurance Law Journal, June, 1954, pp. 406, 420, which states:
"While said certificate states that there is a division of the risk between underwriters at Lloyd's and British companies, nevertheless, the insurance has generally been considered being placed at Lloyd's, and, in the past, many insureds have taken full credit for reinsurance bound under such a certificate.
* * * * *
"Lloyd's brokers, desiring to continue to do business in this country, should take steps to correct these practices. Broker's cover notes should show the proportion placed with Underwriters at Lloyd's and the proportion with British Companies. Properly signed and stamped policies should be delivered within a reasonable time."

that "no coverage whatsoever is in force on this risk." Bodet, Gulf's insurance representative, accepted for Gulf this no coverage advice and the accounts of both Seear (U.S.A.) and Bodet were adjusted to reflect this situation.[9]

■■ Gulf's denial that it was advised of and approved Bodet's action, even if accepted, cannot save the certificate. Compare Romero v. Maryland Cas. Co., supra. Unquestionably, Bodet was Gulf's agent in general charge of its insurance problems and notice to and acceptance by him of the no coverage advice, not only binds his principal, but complies with the formality for cancellation of insurance as required by LSA–R.S. 22:636, subd. A(1). This finding is in accord, not only with the statutory requirement [10] for cancellation but with the Louisiana jurisprudence,[11] and jurisprudence generally [12] on the subject. Bodet here had general authority from his principal not only to obtain, but to maintain insurance, placing and replacing it according to circumstances. While his authority to accept the notice of cancellation for his principal is a question of fact, such authority need not be proved directly or expressly. Where the principal has clothed the broker with full authority to act for it on the subject of insurance, notice to him of cancellation is, in law, notice to his principal.

Judgment accordingly.

9. See LSA–R.S. 22:636, subd. D; compare Romero v. Maryland Cas. Co., 223 La. 783, 66 So.2d 849.

10. There has been no judicial construction of the language of LSA–R.S. 22:636, subd. A(1), which reads: "Written notice of such cancellation must be actually delivered or mailed to the insured * *." Similar language in Paragraph D of LSA–R.S. 22:636, however, requiring that, on cancellation, any unearned premium paid to the insurer "must be actually paid to the insured" has been interpreted by the Louisiana Supreme Court in Romero v. Maryland Cas. Co., supra. In Romero, the Court held a policy properly cancelled under Paragraph D where the assured kept a running account with a local insurance agency, as did Gulf with Bodet here, and where, as here, the local agency credited its client with the unearned premium. In those circumstances, the Court held that the unearned premium was "actually paid to the insured" under the language of the statute.

11. American Fidelity & Casualty Co., Inc. v. Knox, D.C., 164 F.Supp. 3; Brown v. North River Ins. Co. of N. Y., 144 La. 504, 80 So. 674.

The Louisiana Supreme Court in Brown v. North River Ins. Co. of N. Y., supra, while holding that notice to a subagent, unknown to the assured, is not notice of cancellation to the assured, quotes, with approval, 80 So. at page 677, the following excerpt from Clement, Fire Insurance, Vol. 2, p. 418:

"If a broker or agent has general authority from his principal, not only to obtain, but to maintain, insurance, placing and replacing same according to circumstances, in his discretion, having general charge of his principal's insurance, then he may be the agent of the insured for purposes of cancellation and substitution, and the five days' notice required may be dispensed or waived by him. The authority of such an agent or broker becomes a question of fact. A broker is an agent of the insured, and an insurance company is justified in regarding him as clothed with full authority to act for the insured in procuring, modifying, or cancelling a policy, and his acts in respect thereto are the same as if done by his principal."

12. 29 Am.Jur., Insurance § 286. This authority at p. 266 states:

" * * * (I)f the insured constitutes one an agent not only to insure but to keep property insured, with power to select the insurer, notice of cancelation to such agent will bind the insured. A fortiori, the rule is well settled that where the insured authorizes an agent or broker to procure, keep up, cancel, and substitute policies, notice of cancelation given to such agent or broker is a sufficient notice to the insured."